RICHARD L. and LINDA HITTLEMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hittleman v. Commissioner
Docket Nos. 19813-86, 18263-87, 3990-88
United States Tax Court
T.C. Memo 1990-325; 1990 Tax Ct. Memo LEXIS 340; 59 T.C.M. (CCH) 1028; T.C.M. (RIA) 90325; June 27, 1990, Filed *340 Decisions will be entered under Rule 155. Peter R. Stromer, for the petitioners. Stephen R. Asmussen and Jeffrey Heinkel, for the respondent. SHIELDS, Judge. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases three notices of deficiency were mailed by respondent to petitioners in which respondent determined deficiencies in and additions to petitioners' income taxes as follows: Date of
Taxable
Additions to tax under Sections
Notice
Year
Deficiency 6653(b) [1]
6653(b)(1)(B)
6661
Docket No. 19813-86
3/14/86
1979
$ 174,075.00
$ 87,038.00
N/A
N/A
Docket No. 18263-87
3/27/87
1980
64,071.00
32,035.00
N/A
N/A
Docket No. 3990-88
1/21/88
1981
55,102.00
27,551.00
N/A
N/A
1982
48,199.00
24,099.00
*
$ 12,049.75 In the notices of deficiency respondent also determined: (1) that in all years petitioner Richard L. Hittleman is liable for self-employment tax; (2) that in all years Richard L. Hittleman alone is liable for the additions to tax for fraud *341 under section 6653(b); and (3) that the deficiency for each of the years 1981 and 1982 constitutes a substantial underpayment attributable to tax motivated transactions and is subject to the interest provisions of section 6621(c). In his answers respondent claims: (1) that as an alternative to the additions to tax for fraud determined against Richard L. Hittleman alone in the deficiency notices, both petitioners are liable for the additions to tax for negligence or the intentional disregard of rules or regulations under section 6653(a) as applicable in each year; and (2) that the deficiency for each of the years 1979 and 1980 constitutes a substantial underpayment attributable to tax motivated transactions and is subject to the interest provisions of section 6621(c). After concessions the issues remaining for decision are: (1) whether the assessment of the deficiencies and additions to tax determined by respondent are barred by the statute of limitations; (2) whether petitioners understated their income as determined by respondent for the years 1979 through 1982; (3) whether part of any understatement is due to fraudulent acts of petitioner, Richard L. Hittleman; (4) whether, as an *342 alternative to the fraud additions to tax determined with respect to Richard L. Hittleman alone, petitioners are both liable for the additions to tax for negligence or the intentional disregard of rules or regulations under section 6653; (5) whether for 1982 petitioners are liable under section 6661 for the addition to tax for substantial understatement; (6) whether Richard L. Hittleman is liable for self-employment tax; (7) whether petitioners are liable for additional interest under section 6621(c) for the years in issue; and (8) whether damages under section 6673 should be imposed upon petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by reference. Petitioners resided at 1984 Bean Creek Road, Scotts Valley, California, during the years at issue and at the time of filing their petitions. On their timely filed joint income tax returns for 1979 through 1982 petitioners reported gross income in the following amounts: Year
Gross Income
1979
$ 10,439
1980
$ 16,788
1981
$ 17,610
1982
$ 17,005
The 1979 return included a Schedule C for Richard L. Hittleman as an "author/instructor," on which gross income of $ 5,399 was reported and deductions were claimed *343 for commissions of $ 232 and office supplies of $ 78, for a net income of $ 5,089. The joint returns for 1980, 1981, and 1982 did not include similar schedules. Richard L. Hittleman (hereinafter referred to as petitioner in the singular) is the author of several books on the subject of Yoga. Some of the books have been published in languages other than English. Petitioner has also lectured at seminars and workshops on Yoga and for several years has hosted a television program devoted to Yoga. He has been a practitioner of Yoga for more than 50 years, an instructor of Yoga since 1953, and is recognized as a guru, or spiritual leader, by other adherents of the Yoga philosophy. According to petitioner, Yoga is an eastern religion primarily identified in western cultures with certain physical exercises and disciplines and he, as a proponent of Yoga, sought in 1979 through 1982 to expand the awareness of Yoga in the United States beyond its physical aspects to include its religion. A guru of Yoga is expected to periodically hold meetings for a group of followers at his dwelling, which is known as an ashram for the group. The concept of an ashram is unique to the Yoga religion. It serves *344 as a symbol of a bringing together of an individual's total life and existence so that his family and religious practice are not separated. An ashram is the closest thing to a church building in the Yoga religion. In 1977 petitioners purportedly formed an organization called the Yoga Universal Church (YUC). Although witnesses for petitioners frequently referred to such documents in their testimony, the record contains no charter, articles of incorporation, minutes of meetings, financial records, or accounting books for YUC. Petitioner testified that initial funding for YUC came from contributions made by him in the amounts of $ 18,000 in 1977 and $ 12,000 in 1978 for which he claimed charitable contribution deductions for these amounts on his income tax returns. No such deductions were claimed for 1979 through 1982, the years in issue. As a guru for YUC, petitioner conducted periodic meetings and instructional retreats at his residence. The meetings and retreats included meditation, physiological exercises, philosophical discussions, and readings of Yoga scriptures or shastras. On their 1981 income tax return petitioners claimed a nonbusiness casualty loss for storm damage to *345 the residence allegedly used as an ashram for YUC. In his capacity as guru of YUC petitioner performed several marriage ceremonies during 1979 through 1982. YUC also sponsored programs on the tenets of Yoga for prisoners, senior citizens, and the blind. Prior to 1979 petitioner opened accounts in the name of YUC with the brokerage firm of Dean Witter Reynolds and with Great Western Savings and Loan Bank (formerly Northern California Savings and Loan Bank), County Bank of Santa Cruz, and Security Pacific National Bank. Petitioner was listed as the president of YUC on the Dean Witter Reynolds account. Linda Hittleman was listed as treasurer of YUC on the signature cards for the account at Northern California Savings and Loan. Both petitioners had signatory authority over all of the accounts in the name of YUC. In an attempt to establish a tax-exempt status for YUC petitioner applied for and received for YUC an affiliation with the Universal Life Church of Modesto, California (ULC), which during 1979, 1980, 1981, and 1982 was recognized by respondent as a tax-exempt organization. ULC's exempt status was subsequently revoked retroactively by respondent but not until 1984. On the *346 various accounts in the name of YUC petitioner listed the employer identification number of ULC. The initial attempts by respondent's agent to analyze the accounts opened by petitioner in the name of YUC were resisted by petitioners and their counsel. As a result, respondent instituted a summons enforcement proceeding in the District Court and the District Court limited the scope of the examination by respondent to those accounts over which petitioners had signatory authority. Respondent determined that petitioner received but failed to report income with respect to activity in the YUC accounts as follows: Year
Deposits
Interest
1979
$ 222,203.36
$ 3,424.00
1980
$ 115,765.11
$ 6,247.16
1981
$ 117,112.06
$ 4,087.28
1982
$ 114,625.71
$ 8,122.20
Respondent also determined that petitioner had received in 1980 a short term capital gain in the amount of $ 7,195 which was credited to the account with Dean Witter Reynolds. Part of the deposits to the YUC accounts during the years 1979 through 1982 were made with royalty checks from Bantam Books and Workman Publishing Company. These checks represented royalties paid on five books with respect to which petitioner had assigned all of his rights including *347 copyrights to YUC in April of 1978. The assignments were recorded at the U.S. Copyright office on March 21, 1983. The royalty checks from Bantam Books totaled $ 52,208.48 in 1979 and $ 3,250 in 1981. The royalty checks from Workman Publishing were in the following amounts: Year
Amount
1980
$ 30,901.74
1981
$ 38,631.18
1982
$ 29,592.09
All of the royalty checks were payable to YUC and were mailed to YUC at 1984 Bean Creek Road, Scotts Valley, California, the residence of petitioners. The books transferred by petitioner to YUC were entitled Introduction to Yoga, 28 Day Exercise Plan, Guide to Yoga Meditation, Weight Control Through Yoga, and Yoga Natural Foods Cookbook. According to petitioner these books were chosen by him from his publications because he considered them to be the books most closely associated with the religion of Yoga. The assignments were accepted on behalf of YUC by Mort Levitt (Levitt), a longtime friend and the literary agent of petitioner as well as a purported trustee and secretary of YUC. During the years 1979 through 1982 Levitt maintained a residence at 910 West Carmel Valley Road, Carmel Valley, California, which served as a second ashram for YUC. Levitt had *348 also been designated a Yoga swami, or teacher, by petitioner. Receipts from periodic Yoga workshops conducted by petitioner were also deposited in the YUC bank accounts. Respondent also determined that these deposits were income to petitioner. Some of these checks were made payable to Richard Hittleman and the balance to Yoga Workshop or both petitioner and Yoga Workshop. All checks received in 1979 through 1982 by petitioner from participants in the workshops conducted by petitioner were endorsed by him and deposited in the YUC accounts. During 1979 petitioner also bought and sold some silver and gold coins in the name of YUC in transactions with Santa Cruz Coin Exchange. On August 24, 1979, he sold 34 South African Rands for $ 10,914 which he had purchased on May 2, 1979, for $ 8,785.60. On November 30, 1979, he sold for $ 32,760 silver coins having a face value of $ 2,800 which he had purchased on September 14, 1979, for $ 25,060. Respondent determined that from these transactions petitioner realized short term capital gains. On December 4, 1979, petitioner sold a bag of 90 percent silver coins for $ 12,000. Respondent was unable to ascertain the date and the amount of the *349 purchase price of these coins. Consequently, he determined that petitioner realized a short term capital gain from their sale of $ 12,000. Petitioner does not dispute the date and the amount of this sale or that any gain therefrom was a short term capital gain. Respondent also determined that on December 5, 1979, petitioner sold seven bags of silver coins for $ 90,300 for which respondent could not determine a cost or date of purchase. Petitioner disputes respondent's determination that this sale was made for him or for YUC and on cross-examination the proprietor of the coin shop was unable to state that the sale was made by either YUC or petitioner. With numerous checks drawn on the YUC accounts petitioners during the years in dispute paid personal expenses such as for food, utilities, medical services, landscaping, mortgage payments, automobile insurance, and magazine subscriptions, as well as for tuition at a private school and piano lessons for their son. Other checks on the accounts were used by petitioners or with their consent to pay various personal expenses of their longtime friend, Mort Levitt, and his family. OPINION (1) Statute of Limitations. Petitioners contend that *350 the assessment of respondent's determinations are barred by the three-year statute of limitations provided by section 6501(a). [2] On this issue respondent first contends that the fraud exception of section 6501(c)(1) [3] *351 is applicable and, therefore, the deficiencies and additions can be assessed at any time. In the alternative, respondent contends that the six-year statute of limitations provided by section 6501(e)(1)(A) [4] is applicable because for each year in dispute petitioners omitted gross income from their return in excess of 25 percent of the amount of gross income reported in the return. In our consideration below of the amount of gross income determined by respondent to have been unreported by petitioners, we have concluded respondent has proved that petitioners omitted from gross income in each of the years 1979 through 1982 an amount in excess of 25 percent of the gross income reported for such year. Therefore, the six-year period provided by section 6501(e)(1)(A) is applicable and since each deficiency notice was mailed within six years of the date of the filing of the applicable return, the assessment of deficiencies and additions to tax for 1979 through 1982 is not barred by the statute of limitations. (2) Unreported Income. With respect to the royalty checks on *352 the five books transferred by petitioner to YUC, we can see no distinguishable difference between petitioners' case and the situation considered in despite their arguments to the contrary. In Miedaner, the taxpayer, like petitioner, granted certain exclusive rights in his book to a publisher in exchange for royalties. Subsequently the taxpayer assigned all of his rights and interest in the book to the Church of Physical Theology, an entity established by the taxpayer. Thereafter, like petitioner, the taxpayer exercised complete control over the church and its bank account and used the royalty income to pay personal expenses. In Miedaner we concluded that the taxpayer's attempt to shift the incidence of taxation on the royalty income to the church was ineffective because he retained the rights to, and exercised control over such income, and because his sole reason for establishing the church and transferring the royalty rights to it was to avoid taxes. Petitioner contends that is distinguishable because here petitioner assigned not only the anticipated royalty income, but all of his right, title, and interest *353 in the books to YUC, thereby disposing of the "trees" and not merely their "fruit." Petitioners claim that factually their case is more similar to , , and , in which the taxpayers were found to have transferred their entire interest in and not just the right to the income from the property involved. A similar argument was rejected in Miedaner because we found "it unnecessary to analyze in detail the cases dealing with the 'assignment of income' doctrine, which often turn on fine lines of distinction." Instead we decided the issue "on the basis of the totality of the factual circumstances" from which we held that the taxpayer "must be taxed on the disputed amounts of royalty income." . See also . From "the totality of the factual circumstances" before us in this case, we conclude, as we did in Miedaner, that there is no "discernible separate identity between petitioner and his church" since petitioner retained total control during the years under consideration *354 over the church's accounts and other affairs. . With the presence and exercise of such control, the purported assignments are sham transactions without economic substance and the income in question is taxable to petitioner. , . As honorable as petitioner's intentions may have been in establishing YUC, the fact remains that in its operation petitioner exercised such complete control over its funds and used them for personal expenses to such an extent that he has failed to establish that YUC is an entity separate from himself. Again we find ourselves returning to Miedaner, where it was stated: We do not doubt the sincerity of petitioner's beliefs, but we cannot avoid the conclusion that he used the church for his own purposes. It is simply an attempt to transmute the commercial into the ecclesiastical and thus avoid the congressional separation of individual taxable income and exempt religious income. .
For the reasons set forth above we conclude that the deposits made to the YUC accounts from workshops conducted *355 by petitioner are also taxable to petitioner. The same is true with respect to the capital gains realized by petitioner in his transactions with Santa Cruz Coin Exchange with the exception of the $ 90,300 transaction on December 5, 1979. Since, as set forth in our findings, the proprietor of the coin shop was unable to state that this sale was made by either YUC or petitioner, we conclude that respondent's determination with respect to this sale is in error. Therefore from all of the foregoing we find that with the exception of the $ 90,300 coin transaction, respondent's determinations of the amount of unreported income of petitioners for each of the years 1979, 1980, 1981, and 1982 are correct. (3) Additions to Tax Under Section 6653(b) for Fraud. Respondent determined that petitioner, Richard L. Hittleman, is liable for the additions to tax for fraud under section 6653(b). On this issue respondent has the burden of proving by clear and convincing evidence that an underpayment exists for each of the years in issue and that some portion of each underpayment is due to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that petitioner intended to evade *356 taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. . The existence of fraud is a question of fact to be resolved from a consideration of the entire record. , affd. without published opinion .Fraud is never imputed or presumed. It must be established by independent evidence of a fraudulent intent. .However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from proven facts because direct proof of a taxpayer's intent is rarely available. ; The taxpayer's entire course of conduct may be used to establish the requisite fraudulent intent. . In this case respondent relies on four indicia of fraud which he attributes to petitioner. First he points to the fact that the income of petitioners was substantially understated in each of the years 1979 through 1982. While we have found this to be true, such *357 understatements standing alone are not clear and convincing proof that they are the result of a fraudulent intent. Secondly, respondent claims that petitioner's refusal during the audit to supply respondent's agent with the records of YUC, and his active opposition to respondent's summons enforcement actions in the district court are further evidence of a fraudulent intent. Petitioners, however, were represented throughout the audit and the summons enforcement actions by an attorney; and pursuant to his advice, petitioner maintained that YUC was a separate legal entity which was not the subject of respondent's audit, and therefore respondent had no right to YUC's records. Petitioner's position apparently had some merit as indicated by the fact that the District Court in the summons actions limited the scope of respondent's summons to the bank accounts on which petitioner had signatory authority. We are unable to find that petitioner's attempt on the advice of counsel to use a legal procedure which was at least partially available is clear and convincing evidence of fraud. Thirdly, respondent contends that petitioner's fraudulent intent in this case is evidenced by his attempt to *358 conceal the income from the book royalties, the Yoga workshops, the bank accounts, and the coin transactions by using the name of YUC and the identification number of the Universal Life Church of Modesto as YUC's number. As we understand it, respondent's argument is that these steps were taken by petitioner in order to conceal from respondent the interest and the other income reflected in the bank accounts and the coin transactions because, at the time, respondent recognized the Universal Life Church of Modesto as tax-exempt. It is true that during 1979, 1980, 1981, and 1982 ULC was recognized by respondent as a tax-exempt organization under section 501(c)(3). See .In fact such exemption was not retroactively revoked by respondent until August of 1984 and his revocation was not judicially approved until November of 1987. See , affd. without published opinion .However, during the years under consideration, the operations of ULC and its many alleged branch congregations were receiving a great deal of attention from respondent and others. *359 As a result, a number of opinions involving ULC or its branches were issued by this and other Courts. See, for example, See also , in which we concluded that ULC's program was a sham. In many of the cases involving ULC or its branches the taxpayers involved were represented by Peter R. Stromer, counsel for petitioners in this case. In fact he was counsel for petitioner in , and for ULC in In view of the uncertainty which existed during the years under consideration with respect to ULC's exemption and its involvement in numerous tax cases of taxpayers who unwittingly or otherwise became involved in one or more of the programs sponsored by ULC, we are unable to agree with respondent that the use by petitioners in this case of ULC's identification number is clear and convincing evidence of a fraudulent intent on their part. This is especially true in view of the fact that their counsel, a member of the bar of this Court, also represented ULC and was heavily involved in promoting and defending its questionable activities. Finally, *360 as evidence of petitioners' fraudulent intent, respondent points to the deductions taken by petitioners on their 1977 and 1978 returns for contributions made to YUC. The record, however, contains no evidence to support a finding that the 1977 and 1978 contribution deductions were fraudulent or even improper at the time they were made in any respect. Furthermore, the relevance of these deductions is doubtful inasmuch as no such deductions were claimed in the years before us. Consequently, even if we assume that the 1977 and 1978 deductions were improper or even fraudulent the record does not support a finding that such activity continued into the years 1979 through 1982. In view of all of the foregoing we conclude that respondent has failed to carry his burden of proving fraud with clear and convincing evidence in this case. (4) Additions to Tax Under Section 6653. The addition to tax provided by section 6653(a) for 1979 and 1980, and by section 6653(a)(1) for 1981 and 1982, is applicable if any part of an underpayment is due to negligence or the intentional disregard of rules or regulations. The addition to tax provided by section 6653(a)(2) for 1981 and 1982 is due with respect *361 to any portion of an underpayment which is attributable to negligence or intentional disregard of rules or regulations. Negligence under section 6653(a) is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. . We are satisfied that a reasonable and prudent person would not have failed to report all of his income or used the funds of YUC to pay personal expenses as petitioners did. Therefore petitioners are liable for the additions to tax provided by section 6653(a)(1) and (2). (5) Addition to Tax Under Section 6661. Section 6661 provides an addition to tax of 25 percent of the amount of any underpayment which is attributable to a substantial understatement of income tax. Sec. 6661(a). An understatement of income tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1)(A). The understatement of income tax on petitioners' 1982 return is in excess of these limits and petitioners have not shown that any part of the underpayment should be reduced pursuant *362 to section 6661(b)(2)(B). Consequently, petitioners are liable for the addition to tax under section 6661 for such year. (6) Self-Employment Tax. Section 1401 imposes a tax on an individual's net earnings from self-employment. The term "net earnings from self-employment" is defined as the gross income derived by an individual from any trade or business less any allowable deductions attributable to such trade or business. Sec. 1402(a). To be engaged in a trade or business within the meaning of section 1402(a) an individual must be involved in an activity with continuity and regularity; and his primary purpose for engaging in the activity must be for income or profit. .Petitioner is an admitted author and instructor. He has written several books on Yoga and related subjects from which he has received royalties. During the years under consideration petitioner was regularly and continuously engaged in teaching Yoga workshops which produced substantial income. We have concluded hereinbefore that the deposits made to YUC's bank accounts which represent receipts from book royalties and Yoga workshops constitute income attributable *363 to petitioner rather than YUC. Therefore all such income is self-employment income to petitioner which is subject to self-employment tax under section 1401. (7) Additional Interest Under Section 6621(c). Respondent contends that the purported assignments of royalty income to YUC constitute tax motivated transactions which resulted in substantial underpayments in tax by petitioners; and consequently, they are liable for the additional interest provided by section 6621(c) for the years in issue. We have previously concluded from the record as a whole that respondent has proven that the purported assignments were sham transactions without economic substance. See .Therefore, petitioners are liable for the additional interest provided by section 6621 on the underpayments in tax attributables to such transactions.
(8) Damages Under Section 6673. Under section 6673 we are authorized to award damages to the United States if a taxpayer's position is frivolous or groundless, if the taxpayer instituted or maintained the proceeding primarily for delay, or if the taxpayer unreasonably failed to pursue available administrative remedies. From *364 the record as a whole we are convinced and so find that petitioners' positions herein were not entirely frivolous and groundless, that this proceeding was not instituted or maintained primarily for delay, or that petitioners unreasonably failed to pursue administrative remedies. Therefore an award of damages pursuant to section 6673 is not appropriate. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50% of the interest due on $ 48,199.00. ↩
2. The relevant part of section 6501(a) reads as follows: (a) GENERAL RULE. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
3. Section 6501(c)(1) reads as follows: (c) EXCEPTIONS. -- (1) FALSE RETURN. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. 4. Section 6501(e)(1)(A) reads as follows: (A) GENERAL RULE. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed.↩